***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Taylor with minor modifications.
 ********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are bound by and subject to the Workers' Compensation Act. *Page 2 
2. An employment relationship existed between plaintiff and defendant-employer at all times relevant to this claim.
3. The average weekly wage is sufficient to yield the maximum compensation rate for 2005 of $704.00.
4. Plaintiff notified defendant-employer about his right shoulder condition on or about March 31, 2005.
5. Plaintiff was diagnosed with a right rotator cuff tear with underlying impingement on April 20, 2005 by Dr. Kouba.
6. Dr. Kouba performed surgery on plaintiff's right shoulder on May 24, 2005 and on September 6, 2005.
7. Plaintiff returned to work with restrictions on or about January 6, 2006.
8. Plaintiff performed light duty work from approximately January 6, 2006 until approximately February 27, 2006, at which time he went out of work.
9. Plaintiff received $21,319.98 in Accident Sickness (hereinafter "AS") benefits dating from April 10, 2005 until July 16, 2006. The AS benefits were paid pursuant to the 2003 Pension, Insurance and Service Award Agreement between The Goodyear Tire Rubber Company and United Steelworkers of America, and local unions (hereinafter "Agreement"). The Agreement notes that the AS benefit fund is solely sponsored by defendant-employer and plaintiff made no contributions to the fund. Therefore, pursuant to N.C. Gen. Stat. § 97-42, defendants are entitled to a credit for the gross AS benefits paid to plaintiff during his period of disability related to his shoulder condition. The parties acknowledge that recent decisions by the Industrial Commission have granted a 75% credit for gross disability benefits paid. Therefore, the parties agree that should this case be found compensable, *Page 3 
defendants are entitled to a credit of $15,989.99, which is the equivalent of 75% of the gross AS benefits paid to plaintiff.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 52 year old, right-hand dominant male, who had been employed as a machinist at defendant-employer for 30 years.
2. One of the machines that plaintiff frequently operated was the Bridgeport, which is a vertical milling machine. There are three Bridgeport machines in the machine shop.
3. Operating the Bridgeport requires reaching up overhead and exerting about 50 pounds of torque while loosening and tightening the draw bar each time the cutting tool is changed. Operating the Bridgeport also requires reaching up to at least shoulder height to pull down on the drill handle.
4. In addition to operating the Bridgeport, plaintiff's job required him to operate a boring mill, radial drill press, and lathe. Both the boring mill and radial drill press require overhead work. The lathe requires reaching up to shoulder height.
5. Plaintiff is right-handed and he always used his right arm to reach up to tighten and loosen the draw bar, pull down on the drill handle, or otherwise operate the machines.
6. Plaintiff's work as a machinist involved significant amounts of work with his right arm at or above shoulder level, often involving the exertion of force while the right arm was at or above shoulder level. Plaintiff worked at least six days per week, eight hours per day. *Page 4 
7. According to Drs. Kouba, Speer and Wyker, reaching up to shoulder level or above with the arm causes impingement of the rotator cuff tendon because the rotator cuff gets pinched between the bottom of the collarbone and the top of the "ball" of the shoulder joint. Repeated impingement of the rotator cuff tendon leads to impingement syndrome and thins the rotator cuff, which puts it at risk for tearing. When force is involved while the arm is being used at shoulder level or above, the effect is even greater.
8. On March 19, 2005, plaintiff's right shoulder was jerked while he was pulling on a pipe wrench in an effort to help some co-workers loosen a bolt from a tire mold. The bolt broke free and started to slip, but then stopped suddenly. This was unexpected and unusual and constituted an interruption of plaintiff's work routine.
9. Plaintiff experienced some right shoulder pain following the incident on March 19, 2005, but he continued to work. A few days later, he noticed some right shoulder pain while hammering nails on a deck at home.
10. On March 31, 2005, while working, plaintiff discovered that he could not raise his right arm. He reported this to his supervisor and went to the plant dispensary. Plaintiff also went to Urgent Care on this date and was taken out of work, pending evaluation by an orthopedist.
11. On April 20, 2005, plaintiff was evaluated by Dr. Stephen Kouba, an orthopaedic surgeon. Dr. Kouba noted that plaintiff had a "markedly thin" rotator cuff tendon and diagnosed plaintiff with a rotator cuff tear with underlying impingement. Dr. Kouba recommended surgery to treat plaintiff's rotator cuff pathology.
12. Dr. Kouba performed surgery on plaintiff's right shoulder on May 24, 2005 and as plaintiff failed to improve, a more extensive surgery on September 6, 2005. *Page 5 
13. Dr. Kouba released plaintiff to return to work with restrictions as of January 6, 2006. Plaintiff was restricted to no lifting greater than 20 pounds and no overhead lifting or reaching. Plaintiff's restrictions prevented him from working as a machinist.
14. While on light duty, plaintiff was given some housekeeping assignments, which are tasks that are created for workers who are on light duty. One of plaintiff's assignments was to clean off a workbench. This assignment was outside plaintiff's restrictions, and the union filed a grievance on plaintiff's behalf.
15. On February 27, 2006, plaintiff was sent home from work because there was no longer any light duty available to him. At that time, plaintiff was still unable to work as a machinist due to the restrictions on his shoulder.
16. Plaintiff continued to have significant pain and developed a frozen shoulder. Therefore, on February 22, 2006, Dr. Kouba referred plaintiff to Dr. Kevin Speer, an orthopaedic surgeon.
17. On March 23, 2006, plaintiff was evaluated by Dr. Speer. Dr. Speer found that plaintiff still had a significant right shoulder problem and that his shoulder was very dysfunctional at that time. Dr. Speer recommended surgery.
18. Plaintiff underwent right shoulder surgery by Dr. Speer on April 14, 2006.
19. Plaintiff was unable to work when he presented to Dr. Speer and has not yet been released to return to work in any capacity.
20. Defendants retained Edwina S. Carnes, a certified disability management specialist and qualified rehabilitation professional to perform a job site analysis of plaintiff's position. Ms. Carnes is not an ergonomic expert but has prepared job site analyses before. Ms. Carnes conducted a job site analysis of plaintiff's job on March 16, 2006. Ms. Carnes concluded that plaintiff's job was *Page 6 
not a production job and, as such, did not require repetitive movements. Ms. Carnes did not conduct an ergonomic analysis of plaintiff's position and failed to provide any information in her analysis regarding the level of the arms in relation to the shoulder and head in carrying out plaintiff's job duties. Plaintiff's description of his job duties as set out above is given greater weight than the job analysis performed by Ms. Carnes.
21. On May 18, 2006, plaintiff underwent an Independent Medical Evaluation with Dr. Robert T. Wyker. Based upon the job duties performed by plaintiff, Dr. Wyker was of the opinion that plaintiff's job duties were a significant factor in plaintiff's development of his right shoulder condition and that his job duties placed him at an increased risk of suffering from his right shoulder condition than members of the general public not so employed. Indeed, it was Dr. Wyker's opinion that plaintiff's job duties as described above placed plaintiff at a significant risk of developing impingement syndrome and rotator cuff tear of the right shoulder.
22. Dr. Wyker was further of the opinion that although plaintiff probably already had impingement syndrome, the incident of plaintiff working with the pipe wrench on March 19, 2005 is probably what caused the actual tear in plaintiff's right shoulder.
23. Dr. Wyker deferred to Dr. Speer regarding plaintiff's return to work and permanent restrictions.
24. In his deposition, Dr. Kouba opined that plaintiff had impingement syndrome which eventually led to a rotator cuff tear. Dr. Kouba was of the opinion that plaintiff's job placed him at an increased risk of the thinning of the rotator cuff which increased the risk of the eventual tearing of his rotator cuff than members of the general public not so employed. Dr. Kouba believes that the incident of plaintiff pulling the pipe wrench on March 19, 2005 was the triggering event that served as the tipping point for the shoulder tear and shoulder pain. *Page 7 
Dr. Kouba felt that while plaintiff experienced pain in his right shoulder while hammering nails at home, it was much more likely that plaintiff's shoulder tear was caused by the pipe wrench incident on March 19, 2005 and that plaintiff's shoulder condition was not in any way materially aggravated or significantly contributed to by his hammering nails at home. Dr. Kouba was of the opinion that the pipe wrench incident accelerated plaintiff's rotator cuff pathology leading to a tear which eventually required surgery.
25. In his deposition, Dr. Speer opined that plaintiff's job duties as described above placed plaintiff at an increased risk of developing impingement syndrome and rotator cuff tear of the right shoulder than the members of the general public not so employed. Dr. Speer further opined that plaintiff's job duties as described above, more likely than not, contributed to stresses around the shoulder that lead to impingement, tendonitis, bursitis and even possibly tendon pathology and tear. Dr. Speer felt that plaintiff's hammering at home and resulting soreness after his March 19, 2005 pipe wrench incident was not likely to have in any way materially aggravated or significantly contributed to plaintiff's disabling right shoulder condition.
26. From April 3, 2005 until February 22, 2006 and from April 14, 2006 until June 18, 2006, plaintiff was paid $21,319.98 from defendants' accident and sickness benefits fund, which was completely funded by defendant-employer.
27. Plaintiff's job duties, which required significant amounts of shoulder-level-and-above work with the right arm while operating various machines, placed him at an increased risk for developing impingement syndrome of the right shoulder as compared with members of the general public not equally exposed. *Page 8 
28. Plaintiff's job duties also made a significant, or noteworthy, contribution to the development of his shoulder impingement syndrome.
29. On March 19, 2005, plaintiff's right shoulder was jerked while he was pulling on a pipe wrench in an effort to help some co-workers loosen a bolt from a tire mold. The bolt broke free and started to slip, but then stopped suddenly. This was unexpected and unusual and constituted an interruption of plaintiff's work routine.
30. The incident on March 19, 2005 in which plaintiff's right shoulder was jarred served as a tipping point, which accelerated his underlying shoulder impingement syndrome and triggered his right shoulder symptoms.
31. While plaintiff experienced pain in his right shoulder while hammering nails at home, the undersigned find that this incident did not in any way materially aggravate or significantly contribute to plaintiff's ultimately disabling right shoulder condition.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him or her to a greater risk of contracting the disease than the public generally.Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the disease's development. Hardin v. Motor Panels, Inc., 136 N.C. App. 351,524 S.E.2d 368 (2000) (citing Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983). As a result of the nature of his job duties as a machinist for defendant-employer, which *Page 9 
required significant amount of shoulder-level-and-above work with the right arm, plaintiff developed right shoulder impingement syndrome. Plaintiff's job duties with defendant-employer placed him at an increased risk of developing right shoulder impingement syndrome and right rotator cuff tear than members of the general public not so employed. Plaintiff's right shoulder impingement and rotator cuff tear were caused or significantly contributed to by his job duties with defendant-employer.
2. In order for an injury to be compensable under the Workers' Compensation Act, it must be the result of an accident arising out of an in the course of employment. N.C. Gen. Stat. § 97-2(6). Plaintiff has the burden of proving that the injury complained of resulted from an injury by accident arising out of and in the course of the employment.Henry v. A.C. Lawrence Leather Co., 231 N.C. 477, 57 S.E.2d 760 (1950). On March 19, 2005, plaintiff sustained an injury by accident involving his right shoulder, which arose out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). Plaintiff has proven by the greater weight of the competent evidence that a causal relationship existed between the work-related accident and the disability for which compensation is sought. As a direct and proximate result of the March 19, 2005 accident, plaintiff sustained a right rotator cuff tear. Click v. Freight Carriers, 300 N.C. 164,265 S.E.2d 389 (1980).
3. As a direct and proximate result of his occupational disease of shoulder impingement syndrome and his injury by accident resulting in a right rotator cuff tear, plaintiff was and is unable to earn the same or any other wages from March 31, 2005 until January 6, 2006 and from February 27, 2006 and continuing. Plaintiff is entitled to temporary total disability compensation from March 31, 2005 until January 6, 2006 and from February 27, 2006 to the present, and continuing until he returns to work. N.C. Gen. Stat. § 97-29. *Page 10 
4. Defendants are entitled a deduction of $15,989.99 pursuant to the terms contained in N.C. Gen. Stat. § 97-42 for disability payments made to plaintiff. N.C. Gen. Stat. § 97-42.
5. Plaintiff is entitled to medical compensation for all related medical expenses incurred, or to be incurred, as a result of his shoulder impingement syndrome and injury by accident. N.C. Gen. Stat. §§ 97-25; 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following:
 AWARD
1. Subject to a reasonable attorney's fee approved herein, defendants shall pay to plaintiff temporary total disability compensation at the rate of $704.00 per week from March 31, 2005 until January 6, 2006 and from February 27, 2006 to the present, and continuing until plaintiff returns to work. Portions of this compensation have accrued and shall be paid in a lump sum.
2. Defendants are entitled a deduction of $15,989.99 pursuant to the terms contained in N.C. Gen. Stat. § 97-42 for disability payments made to plaintiff.
3. A reasonable attorney's fee of 25% on the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from the amounts due plaintiff and paid directly to plaintiff's counsel. For future compensation, every fourth check shall be paid to plaintiff's counsel.
4. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as a result of his compensable occupational disease and compensable injury by accident. *Page 11 
5. Defendants shall pay the costs, including, if not already paid, an expert witness fee of $670.00 to Dr. Wyker.
This the 28th day of June 2007.
S/_________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_________________ BUCK LATTIMORE COMMISSIONER
 S/_________________ PAMELA T. YOUNG COMMISSIONER *Page 1